Well, it's always a joyous occasion, so we've started off the day on the good foot, as they say. So, Mr. Davis. Thank you, Your Honor. Welcome to you, and would you like to reserve some time, sir? Yes, please. I would like to reserve two minutes for rebuttal. My name is Preston L. Davis, and I am counsel for Milton Regional Sewer Authority, to whom I will refer hereafter as MRSA. Go ahead, sir. If the court please, this project involves the replacement of approximately one mile of sewer force main with a gravity flow line. The issue before the court is whether the contractor's failure constituted a material breach of the contract sufficient to excuse MRSA from affording a 30-day right to cure before termination. So, the question I have for you has to do with the role of the engineer, as that's focused on in the agreement. So, specifically sections 9.08, 9.09, and 10.05. Yes, sir. So, when I look at all of the clauses that focus on the engineer, it appears that the engineer is to play a prominent role in determining the progress of the project and whether or not, in fact, there's a breach. And obviously, the letters involved here outlining the deficiencies and then ultimately the termination are penned by the engineer. But the specific provisions that I've referred to also give the engineer the opportunity to say they think that there are deficiencies and whether the deficiencies should lead to termination. But more important, there seems to be outlined a procedure that needs to be followed once the engineer has determined that termination is appropriate. Was the process outlined in the contract followed here with regard to the engineer's role? Yes, Your Honor. There were regular and consistent contractor's meetings with the engineer. At which time, progress was discussed and deficiencies were pointed out. Those are reflected in the letters, which confirmed what took place in those conferences. But I thought that, obviously the letters say that, but I thought there comes a time in the progress of the contract where if there's a disagreement with the engineer's conclusion, and here the conclusion was termination for cause, that there was either a mediation process or some sort of mediation arbitration process that was to be followed that's specifically referred to. Was that followed? No. It's my understanding that is not required in this instance. What was required was that there would be, after the notice of intent was issued, that there would be a meeting between all of the parties where these matters would be discussed, and that did take place. My understanding is similar to Judge Greenaway's, that there were required steps that had to be taken after the engineer decided the contract should be terminated, including a right to cure. That's correct, and it's our position that the deficiencies were so great that they constituted a material breach of the contract, which excused the authority from affording the right to cure. Well, your contract provides for a right to cure. Obviously, the sewer authority must have reviewed the contractor before the contract was issued to see if the contractor was experienced in doing this type of work, and the contract was drawn up with the right to cure, and is any contract going to be binding if simple misfeasance, a poor workmanship of the work called for under the contract is sufficient to break it? I mean, what's the point of a right to cure if you can't cure your poor workmanship? If it pleases the Court, the position of the authority was that by reason of its failure to rectify its faults as it went along, and as they were pointed out, and by reason of some of the very clear violations of the terms of the contract, that the contractor had reflected an inability to perform the contract as it was written, and that's why they terminated it, and that's why they did not afford him the right to cure. They figured that if he tried to cure, it would only get worse. Well, then if he tried to cure, if he got his contractual right to try to cure, and he doesn't do it, then it's a very different situation, but, you know, sometimes raising kids, you tell them not to do it, and you tell them not to do it, and you give them an ultimatum, and all of a sudden they shape up, and isn't that what a right to cure is meant to produce? A point where the contractor realizes, man, I've really got to get this done or I'm in deep trouble. Well, it's our position that that was made very plain numerous times before this, without any reaction on the part of the contractor, without any cure, without any correction, so that the breach had occurred before the right to cure arose. The cases cited are really cases where you can't cure. I mean, this is a case of poor workmanship. You can cure poor workmanship. You can't cure fraud. You can't cure dishonesty, but when you're dealing with the type of breach that can be cured by doing the job with good workmanship, I think the right to cure contractual provision is binding. Well, with all due respect, Your Honor, the right to cure – Now you know where I'm coming from. I understand where you're coming from, and the right to cure is limited to a 30-day period, and there was no indication that they were able to do that. Well, I thought when you sent the February 28th letter, and then there was a follow-up meeting and then the March 23rd letter, there was no opportunity between February 28th and March 23rd for them to do anything, because, as I recall, the January letter and then the February letter enunciated both the client and the engineer's dissatisfaction, and both made it fairly clear that curing was not in the offing. So when was there the opportunity to cure? Well, the opportunity to cure was after the January letter. The contractor had an opportunity between January and February to improve their performance? Absolutely. That's what was expected. In fact, it was indicated in that letter that we were going to be monitoring you to see if that happens. It did not. It appears from the February 28th letter that that was your view as to everything. There was nothing that they were able to cure during that period of time? That's correct. The complaint recites a number of defects or defaults in the work, and I was unable to figure out, does the 30-day period run on all of these because they were sequential, or did they all occur before the notice that was given? Well, they all occurred before the notice. The question would be if the 30-day right to cure occurred, when it would have triggered, and it would have triggered in February for them to correct all of those deficiencies or defaults. Good. But Judge Roth raises, I think, an important point, and that in most of the cases where the clause that permits a defaulting contractor to cure has been interpreted to not allow them to do that, there have been cases involving fraud where somebody has acted in such a way that is dishonest that really goes to the essence of the relationship, whereas this is just a number of instances where the work was shoddily done or proper safety procedures were not followed, all of which, it would seem to me, would be capable of being cured. If it pleases the Court, there is in those cases a statement that a material breach is sufficient to eliminate the right to cure. The District Court and some of you are indicating that these are kind of trivial defects, defaults, deficiencies that could be corrected. They're not. Again, I point you back to where I started. We're talking about a mile of ground-to-floor transmission. That means that all of the inverts, the depths, elevations, and the slopes had to be very precise so that there was not a stoppage. This was not happening. They weren't even making an effort to do that. The lines were misaligned. They were not at the proper elevations. They were not at the proper slopes. Could it be cured? Sure, it was cured. How? By taking it all out of the stomach and over. The feeling was this outfit just isn't capable of doing it. Do you agree that LJL sets out the proper standard here? No, I agree that that's the initial standard, but that's not the only standard. Well, your adversary focuses on the fact that the material defects have to be so egregious as to be incurable. Now, if I hear you correctly, your client came to the conclusion that the shoddy, using your word, workmanship was such that they didn't want to go back. But does that fit the standard of LJL that it was, I think the exact wording of the case is, that it was so serious as to be incurable? That was the conclusion of the authority with respect to the work that had been performed and the way it had been performed, that they were not capable of doing it properly. Do we have to focus on 3.1 of the surety bond to determine this issue of cure, or do we look to 1502D? I think 1502D. Why isn't it 3.1? Because the bond was related to the contract itself. But I thought that 1502F. One second. One second. I thought that 1502F said, if and to the extent the contractor has provided a performance bond under the provisions of paragraph 5.01A, the termination procedures of that bond shall supersede the provisions of 1502B and C, meaning that you go to 3.01. Is that not correct? No, I think it is correct, yes. So we should focus on 3.01? Yes. Okay. Thank you so much. We'll get you out of the bottle. Thank you. Mr. Kingsley? Good morning. Good morning, sir. May it please the Court. I'm Pat Kingsley. I represent Travelers, the epilee, the bonding company that issued the surety bond that stood behind the work of Ankowitz, the general contractor. The question before the Court is, can an owner violate, strip away, a cure protection written in, guaranteed into a contract, in favor of a general contractor on a construction job, and then foist the financial consequences of that decision on the general contractor's surety? Are you saying that shoddy workmanship doesn't count in this case? I am absolutely positively saying that. And yet Mr. Davis, I think, correctly points out how bad the workmanship was and the safety hazards that were created, the tremendous delays. I mean, everything was going wrong. Well, that's what's alleged, and you have to assume that's true. And I'll get to the allegations in one second. But to put the two pieces of the puzzle together, I want to reference the standard. All right. Mr. Davis repeatedly said if there's a material breach, then they get to ignore the contractual protection. And that is absolutely not the standard. So the rule in Pennsylvania for over 100 years has been, conditions proceeding to contract termination must be strictly fulfilled. That is the jurisprudence of this state forever. Pennsylvania Supreme Court, five years ago, created an exception. And the exception was, by its own terms, meant to be extremely narrow for only the most extreme and egregious circumstances. It doesn't say egregious. It says serious. It says there's like five or six different adjectives in the decision, all of which are superlative adjectives. The Supreme Court indicated it's meant to be an extreme situation. And the standard itself, it's articulated in the Supreme Court decision in the first paragraph. The first paragraph of the Supreme Court decision is two sentences long. The first sentence sets out the question, and the second sentence answers the question. And here's the standard that the Pennsylvania Supreme Court articulated. We conclude that Pennsylvania law permits the immediate termination of such a contract when there is a material breach of the contract so serious, it goes directly to the heart and essence of the contract, rendering the breach incurable. Rendering the breach incurable. So the breach has to be rendered incurable. Okay, so now what is it that's alleged in this case? Well, there was a discussion of timing, and I think we got, I think, based on questions before you, you got to the right answer, but I want to emphasize that the ultimatum letter required by the contract came on February 20. February 20 is the day that the cure period starts. Everything before that doesn't matter. They have a right to. February 20? February 20 letter. It's attached to the complaint. It's attached to the amended complaint. This was argued in the court below. The judge's decision from May concludes that the February 20 letter was the ultimatum letter, and there's no appeal from that decision. And I think you just admitted that that's the start of the letter. Okay, here's what the letter said, and, again, this is within the pleadings because it's attached to all the complaints, that the engineer has decided that the installed piping between manhole two and manhole three does not meet the required slope, and the invert of manhole two does not meet the required elevation. That's the letter. Now, here's my question. Is that incurable? That is self-evidently curable. As counsel said, this is a sewer. Can I ask you a question? Sure. So 1502A is what the parties agreed to under the agreement as basis for performance problems. It sets out, I believe, four different performance problems, each one of which I believe MRSA had problems with. I mean, of the 27, they fell into, I think, all four of those categories. And what I want to know is when you have, on a motion to dismiss, 27 allegations of problems that you've had, and they all fall within 1502A, is it such a leap to say that not only is there material breach, but it is so serious that it's incurable? That's a huge leap, for a couple reasons. First is Milton Seward has never, ever argued, even once, that these were incurable. Now, the question that the Pennsylvania Supreme Court puts before all of us is, is it curable? Not, would anchoids have cured if they were given the chance? Maybe they would, and maybe they wouldn't. And if they didn't cure within the time period, then they get to fire them, they get to make a surety bond claim. But if they do cure, then everything is hunky-dory, back on track, and my client, the surety, has suffered no detriment. So the question isn't, I'm going to play it forward in my mind's eye and guess as to what the outcome would have been. The question is, is it incurable? Is there nothing that anchoids could do, in theory, to solve this problem? And the problem identified in the ultimatum letter was that the sewer was a little bit too shallow. Well, what do you do in that case? You dig it up, you make it a little steeper, you put the dirt back on top. Which, according to the complaint and the amended complaint, and the brief submitted by Milton in this case, anchoids was begging to do. They wrote, they went to a meeting and verbally asked, please let us cure, whatever it is you're claiming we did wrong, we will cure. The surety was at those meetings and said it too. And they said, no, we're not even going to let you try because we think you're a lousy contractor. But that's not what the contract says, and that's not what the law says. They have the right to try. Does 3.1 govern this, or should we be looking to the other provision? I think both. I think there's a process identified in the bond and in the construction contract. On the cure provision? Yeah, on the cure provision. We should look at both. You look at both. The one issue is 15D, the one you referenced. So you're right, 15F, 1502F says you look to the bond to replace a couple of the paragraphs, but 1502D, the paragraph that gives you the cure protection, is not taken out. That's still a part of the contract. Well, if 1502D and 3.1 are inconsistent when read together, then what? Well, they're not inconsistent. They're completely consistent. There's a process by which, by the way, Milton, and it's funny because this was raised in front of the trial judge, and I said, you know, I'm saying now for purposes of this argument that the February 20th letter is the ultimatum letter. I think they screwed up the process from start to finish. I think they screwed up the process at every step of the way. But my argument is only focused on one thing. Under 3.1, they have to indicate that they're considering declaring a contractor default, and then under 3.2 or 3.3 of the bond, they have to formally terminate the contract pursuant to the construction contract, and that requires the notice to cure. So they have to give the notice to cure and then see it through. But then why isn't the document that we need to look at, not the February 20th letter, but the February 28th letter, because that includes the notice to travelers, which is really when the clock starts, right? The clock can't start until travelers is informed. Okay, so that's an interesting question. I think ultimately for purposes of this motion, it doesn't matter, because whichever letter you choose to look at, they violated the contract. The February 20th letter said, we think you're a bad contractor and we are firing you. Oh, and by the way, you can't come back and try to cure this. That's what the February 20th letter said. The February 28th letter also said that, only it was longer. So it doesn't really matter which letter you start with. At the moment they got the ultimatum, which they were required to get under the contract, they were forbidden from coming back on the job. So here's a problem. The slope is a little too shallow. Again, you're kicked out. You can't come back and cure it. Yeah, but to be fair, right, there's much more on the February 28th. There is much more on the February 28th, all of which is curable. And by the way, that was the question that Your Honor asked. There's never been an argument from Milton that this stuff wasn't incurable. And I think if I just heard opposing counsel correctly, he said, of course it was curable. We cured it. No, but the case that you cite to says that the problem is so serious as to render it incurable. And the only example of that in all of the jurisprudence that I have been able to see and all of the jurisprudence that the Pennsylvania Supreme Court relies on are cases involving fraudulent conduct, where it is theoretically impossible to fix the problem. In the case of the LGL decision, it was a franchisee decision involving freight, carrying freight. And the franchisee was cheating its franchisor by doing an end run around and shipping product through a competitor. The leading case, the one that the Pennsylvania Supreme Court said was the seminal case, was the Olin decision from 40 years ago, where you had a warehouseman who was taking fertilizer and was supposed to put 50 pounds of fertilizer in bags and sell them to the franchisor's customers. But instead he was cheating. He was stealing 5 pounds of fertilizer, putting 45 pounds in, and selling the other 5 pounds on the fertilizer black market or whatever it was. But cheating, stealing. So it wasn't just fraud, it was criminal conduct. The Larkin decision, which was the Iowa Supreme Court decision, was a hotel franchisee who was stealing rebate money. And the Iowa Supreme Court said, listen, giving the money back doesn't matter. That decision cited Corbin on contracts analyzing this jurisprudence that said, I think the quote is something like this, it's in the materials, no amount of repayment for past thefts can restore the contract. No amount of repayment is going to undefraud your counterparty. You are now a thief and you can't become an un-thief. But if you're a painter on a contract and you paint something the wrong color, you can paint it the right color. So let me ask you this. So let's assume February 28th is the day, and let's assume for the moment March 23rd is not the date of the ultimate termination letter. You're given about 30 days, and you don't do it, and they give you notice in April. Would we be here? Let me see if I understand the courts. If they gave notice properly, an ultimatum letter, and they gave a time period. They gave you the 30 days, you didn't do it in 30 days, we wouldn't be here, right? I think that's probably right. I mean, there could be more facts to it, but in broad terms, I think that's right. By the way, there's a seven-day period in the cure provision as well, that means they have to mobilize and get started. So if they sit on their hands and do absolutely nothing on the eighth day, I think you'd probably fire them. But that's not what was happening. They were begging you to come back, whatever you're complaining about. If you think the sewer is a little too shallow, we'll dig it up and make it steeper. Which is what happened. Fairchild Brothers, as conceded in the complaint and the amended complaint, they hired Fairchild Brothers, a replacement contractor, who did exactly that. And that is the opportunity that was denied Ankowitz, our principal. And I can tell you as a surety, when an ultimatum letter comes in, it hits your desk like a brick. As a surety, you call up your principal, the general contractor, and you say, what is going on, make it right. But we didn't have to do that in this case. They were begging to make it right. Could you answer the engineer question? It's like, why do they have this engineer clause in here, several clauses, when it doesn't appear that anybody is paying attention to it? Your Honor, that is a very good question. I do not think I can answer the question. I would need to read. I just was not – I know there are provisions dealing with the engineer. I have been focused sort of on the end of the process, which is the ultimatum letter and the cure protection. And that I can tell you quite definitively. There is a cure protection. There is a requirement that we be given the right to cure, and that was taken away from us. Well, let me ask you this. I understand that you might not be – have done the deep dive, so to speak, on the engineer's clause. But assume for a moment that in the contract, the provisions with regard to the engineer give the engineer control over oversight and to make the determination of whether the work is worthy and so forth and compliant with all the regulations and so forth. It appears that there is a process for resolving any claims that could happen internal to the contract that has to go through the engineer to some sort of mediation process. Now, Mr. Davis appears to believe that that didn't happen. I think the same would be so of you. Does that – if, in fact, that process was specific to the contract, is that the best of jurisdiction here? I would have to take a hard look. I would have to do the deep dive into that question. That is a very legitimate question. No party or court has ever raised that until just now. It is a very good question. I would think the answer is no. All right. Article 16 says dispute resolution. Either owner or contractor may request mediation of any claims submitted to the engineer for a decision under paragraph 10.05. I'm sorry, Your Honor. Can you tell me the paragraph? Article 16, 16.01, dispute resolution. So, again, I'm not doing a deep dive. I'm doing a very quick response. It looks like it's permissive mediation rather than mandatory mediation. It is permissive. Does that answer Your Honor's question? Okay. So, the other argument that Milton makes is we, Milton, subjectively believe this is a lousy contractor, and therefore we get to play it forward in our head and come to the conclusion that they would have failed, and therefore we get to jump the gun and terminate them now without giving them the right. But that is exactly contrary to what the contract provision says. The contract says they get the right to try. And we, as the surety, get the right to stand behind their effort to try. And that is exactly what was taken away from them. And the Pennsylvania Supreme Court and all of the jurisprudence cited by the Pennsylvania Supreme Court says, unless it's incurable, unless it is theoretically incapable of being cured, at the moment that you get the ultimatum, you have to let them try. Do you have anything more? Thank you so much. Okay. Thank you. Please, the Court, I'll take just one moment. Obviously, in this case, if the lower court is reversed, MRSA still bears the burden of proving all of its allegations and that they constitute a material breach. That still can be determined and should be determined by the fact finder. The burden that that creates, MRSA is willing to bear. All right. Thank you very much for a case that was well argued, and we appreciate it. We'll take it under advisement. Thank you. Thank you.